# Third District Court of Appeal

## State of Florida

Opinion filed April 26, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D17-79
Lower Tribunal No. 15-16544A; B; C; D; & E
_____

## **Miami Herald Media Company and WPLG, Inc.,**
Petitioners,

vs.

## **In Re: State of Florida vs. Kaheem Arbelo, et al.,**
Respondents.

A Case of Original Jurisdiction – Petition for review.

Holland & Knight LLP, and Sanford L. Bohrer and Scott D. Ponce; Mitrani Rynor, et al., and Karen Williams Kammer, P.A., for petitioners.

Pamela Jo Bondi, Attorney General, and Jonathan Tanoos, Assistant Attorney General, for respondent State of Florida; Scott W. Sakin (Fort Lauderdale), for respondent Desiray Strickland; Eugene Zenobi, Criminal Conflict and Civil Regional Counsel, Third Region, and Philip L. Reizenstein, Assistant Regional Counsel, for respondent Kaheem Arbelo; Lane Abraham, for respondent Joseph Cabrera; Carlos J. Martinez, Public Defender, and John Eddy Morrison, Assistant Public Defender, for respondent Jonathan Lucas.

Before LAGOA, SALTER and LOGUE, JJ.

SALTER, J.

Two media intervenors, Miami Herald Media Co. and WPLG, Inc., petition for expedited review of four trial court orders denying access to certain records and to one forthcoming pretrial hearing in a high-profile murder case. We deny the petition on the merits, finding that the trial judge's orders were entered only after she carefully considered the record and applicable law. The trial court granted many of the requests for records made by the media intervenors, but it is not our role or right to re-weigh the trial court's assessment of the facts underlying her conclusion that restrictions on access to other pretrial discovery and to an Arthur hearing[1] are necessary in this case to prevent substantial prejudice to the defendants.

I.    Standard of Review

This case is governed by Florida Rule of Appellate Procedure 9.100(d). Our standard of review is the standard we apply regarding original petitions for certiorari. Florida Freedom Newspapers, Inc. v. McCrary, 520 So. 2d 32, 33 (Fla. 1988) (affirming district court order, which reviewed the media petition under the

---

[1] State v. Arthur, 390 So. 2d 717 (Fla. 1980). An Arthur hearing requires the State to present evidence that the proof is evident, or presumption great, of a defendant's guilt in order to support pretrial detention of the defendant. Pertinent to the present case, such evidence at the pretrial Arthur hearing may include (for example) alleged videotaped confessions or statements of the defendants, videotaped statements by witnesses, investigative reports, and crime scene evidence.

certiorari standard of review); Lake v. State, 193 So. 3d 932, 933 (Fla. 4th DCA 2016) (denying a petition for review of a pretrial order refusing to close court proceedings because the court did not depart from the essential requirements of law); Times Publ'g Co. v. State, 903 So. 2d 322, 327 (Fla. 2d DCA 2005) (trial court order denying public access to discovery materials relating to a criminal prosecution reviewed for a departure from the essential requirements of law).

With respect to the trial court's findings of fact in ruling on the petitioners' motions for media access, we will defer to the findings if supported by competent, substantial evidence. The specific findings that closure is essential to preserve the defendants' rights, and that no reasonable alternatives exist, must be articulated in a written ruling or in "the transcripts of discussions held on the relevant closure issues." Morris Publ'g Grp., LLC v. State, 136 So. 2d, 770, 775 n. 4 (Fla. 1st DCA 2014).

II.    Analysis

A.    Balancing Rights Today: Social Media vs. Press and Television

The media intervenors' motions in the trial court required a balancing of the defendants' due process right to a fair trial in Miami-Dade County, where the charged offenses allegedly were committed, Art. I, § 16(a), Fla. Const. (1968), and the rights of the public and media to access records under Chapter 119, Florida Statutes (2016), and to observe in-court proceedings under Richmond Newpapers,

3

Inc. v. Virginia, 448 U.S. 555 (1980); Gannett Co. v. DePasquale, 443 U.S. 368 (1979).[2]

These competing rights were addressed by the Supreme Court of Florida in Miami Herald Publishing Co. v. Lewis, 426 So. 2d 1 (Fla. 1982). Lewis adopted a "three-pronged test" in assessing such cases, and it carefully differentiated between pretrial proceedings in criminal cases and the actual trials of such cases. Importantly, the present case involves demands for information revealing the substance of a confession (exempt from disclosure under section 119.071(2)(e), Florida Statutes (2016), as specifically found by the trial court) and for other **pretrial** discovery materials. See Lewis, 426 So. 2d at 5. The orders below and the petition here do not require us to address the higher constitutional rights of access to the courtroom and case-related records applicable to a **trial**.

The "three-pronged test" established in Lewis and applicable to a "closure of a pretrial hearing" considers whether:

> 1. Closure is necessary to prevent a serious and imminent threat to the administration of justice;
>
> 2. No alternatives are available, other than change of venue, which would protect a defendant's right to a fair trial; and

---

[2] All of the authorities in this paragraph were addressed by the trial court in the "First Interim Order on Defendants' Joint Motion to Preclude Public Access to Discovery," and that order was also referred to in the Third Interim Order challenged in the petition.

4

3. Closure would be effective in protecting the rights of the accused, without being broader than necessary to accomplish this purpose.

Id. at 3.

The trial court received evidence and argument on each of these prongs, and rendered findings on them on the record and in her orders. A critical finding, supported by the record in the case, is her determination regarding the likelihood of prejudicial pretrial publicity:

> This Court finds that the instant case has attracted extraordinary media interest and that the Defendants' rights to receive a fair trial by jury, uninfluenced by matters or persons outside the courtroom, necessitate for this Court to deny access to the Media, of certain portions of discovery, at this time. Additionally, the denial of access in this case is not absolute, but only temporary. Once the danger of prejudice has dissipated, discovery material will be made available.

First Interim Order (Nov. 8, 2016), p. 3.

"Extraordinary media interest" today is a far cry from pretrial publicity as it existed at the time of Lewis, Richmond Newspapers, Inc., and Gannett Co. Social media and the dissemination of inflammatory images and incidents at the speed of light ("going viral" rather than reaching an audience in a 24-hour news cycle) have grown exponentially. "This level of media saturation exposes a larger number of prospective jurors to potentially prejudicial information about more upcoming trials than ever before in history, making it more difficult to select impartial jurors for trial and to maintain their impartiality during trial."[3]

5

The media intervenors' motions and briefs understate the horrific allegations that have already been disclosed and have apparently honed the media's appetite for more. The allegations include claims that a student in a federal job training program used a machete to kill the teenaged victim (also a student in the program); that other students in the training program participated in the homicide; and that two of the student participants had sex next to the grave in which they buried the victim. The State has filed a notice of intention to seek the death penalty against one of the defendants.

The arrest reports and video released of one defendant, Ms. Strickland, circulated via traditional media and social media, appearing extensively in Miami-Dade County, in out-of-state tabloids, in El Salvador, and in Europe. When the trial court released videotape of Ms. Strickland's statement in its entirety in the First Interim Order—based on a determination that it was not a confession and did not contain information revealing the substance of a confession—the record reflected, and the trial court found, that "widespread adverse publicity immediately resulted from its release, in local as well as numerous internet websites."[4]

---

[3] Nicole L. Walters, Paula Hannaford-Agor, Jurors 24/7: the Impact of New Media on Jurors, Public Perceptions of the Jury System, and the American Criminal Justice System, National Center for State Courts, (2012) at 1, http://www.ncsc-jurystudies.org/~/media/Microsites/Files/CJS/What%20We%20Do/Jurors_%2024-7_REV011512.ashx (last visited April 12, 2017).

[4] Order on Defendants' Motion to Close Courtroom for Arthur Hearings, Jan. 3, 2017, at 5 ("Closure Order").

The case law on pretrial publicity often addresses such publicity in connection with a motion to change venue. In doing so, the Supreme Court of Florida has held that "pretrial publicity must be examined with attention to a number of circumstances, including (1) when the publicity occurred in relation to the time of the crime and the trial; (2) whether the publicity was made up of factual or inflammatory stories; (3) whether the publicity favored the prosecution's side of the story; (4) the size of the community exposed to the publicity; and (5) whether the defendant exhausted all of his peremptory challenges in seating the jury." State v. Knight, 866 So. 2d 1195, 1209 (Fla. 2003) (citations omitted). Excluding element (5), because the case at hand involves pretrial issues rather than consideration at or after trial, element (1) is concerning because each iteration of publicity occurs closer to the ultimate trial of the case. Element (2) is particularly concerning, because (and as the trial court found), the images and video are unquestionably "inflammatory." As to element (3), the images and information clearly favor the prosecution, because the pretrial release of purported videotaped confessions could cause prospective venire persons to prejudge guilt—and yet part or all of the videotapes might later be excluded for reasons not yet presented to, or ruled upon, by the trial court. As to element (4), the size of Miami-Dade County (a population of approximately 2.6 million residents, though the jury pool is obviously a subset of that number) may mitigate some of the concerns regarding

7

the effects of pretrial publicity, but the parties have provided no evidence relating to the effects of social media on this factor.

A recent law review article,[5] however, has surveyed empirical studies which have found that:

> [C]ertain types of pretrial publicity have a statistically significant prejudicial effect on juries. Examples include the following: information regarding a prior criminal record of the accused, a confession of the accused (even if retracted), results of tests implicating the accused, inadmissible incriminating evidence, and statements regarding the character of the accused. Such information has a cumulative effect: the more of it an individual receives, the more likely she is to adjudge the accused guilty.

Tarkington, *supra note 5*, at 1917-18 (internal footnotes omitted).

Such studies also conclude that "emotional pretrial publicity (meaning publicity arousing public passion but with no inculpatory information, such as graphic crime scene pictures) has strong prejudicial effects even when completely irrelevant to determining the guilt of the accused." Id. (internal footnotes omitted). The record in the present case includes precisely such "emotional" or "graphic" but irrelevant information and images. The speed of dissemination and the high percentage of likely jurors with access to social media and the internet also support the trial judge's concern.

---

[5] Margaret Tarkington, *Lost in Compromise: Free Speech, Criminal Justice, and Attorney Pretrial Publicity*, 66 U. Fla. L. Rev. 1873 (2015) ("Tarkington"). Although the article addresses the limitations on pretrial publicity by attorneys, it surveys research, empirical studies, and meta-analytic reviews regarding the effects of negative pretrial publicity on juries.

### B.    Courtroom Closure for the Arthur Hearings

The seven-page Closure Order (January 3, 2017) and the hearing on the defendants' closure motions carefully addressed the three-pronged test established in <u>Lewis</u>.  The court correctly observed at the outset that evidence presented by the State during the <u>Arthur</u> hearing "may include previously precluded evidence that has been sealed by this Court's previous Interim Orders."  The media intervenors' petition asserts that the trial court ordered closure for the hearing "[w]ithout citation to any supporting authority, record evidence, empirical studies, or expert witness testimony,"[6] but that characterization is belied by the record.

First, the trial judge reviewed many of the videos, images, and documents in contention, not once, but twice.  Because she directed the release of several videotapes with specific redactions of portions held exempt under section 119.071(2)(e), she ordered the State to provide the redacted materials to the Court for a further in camera review to be certain that her instructions had been followed; only then did she approve the release of the items.[7]

Second, the trial judge's four orders—three interim orders on discovery, and a separate order regarding closure for the <u>Arthur</u> hearing—are hardly "without citation to any supporting authority."  The First Interim Order, for example,

---

[6]  Petition at 1.

[7]  First Interim Order at 4.

addresses section 119.071(2)(e), the <u>Lewis</u> case, and <u>Times Publishing Co. v.</u> <u>State</u>.[8]  The Closure Order discusses the burden on the State and the type of evidence that might be presented during the <u>Arthur</u> hearing, and assesses the balancing required under each of the three prongs of <u>Lewis</u>.  The trial judge found that "confessions or admissions by a defendant are blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," citing <u>Skilling v. United States</u>, 561 U.S. 358, 382-83 (2010).  She considered and rejected as distinguishable (and non-binding) three circuit court opinions provided by the petitioners.[9]

Finally, as to evidentiary support, the closure order correctly observes that the court had before it "evidence of extensive local, national and international print and broadcast media coverage of the instant case."  The media petitioners did not question or object to the sensational print and online stories and images from Florida, England, Ireland, Iceland, El Salvador and other sources as submitted by the respondents.  These materials support the court's finding that "there has been extensive and pervasive local, national and international print, broadcast and media

---

[8]  827 So. 2d 1040 (Fla. 2d DCA 2002).

[9]  <u>State v. Lopez</u>, 44 Med. L. Rptr. 1664 (Fla. 17th Cir. Ct. 2016); <u>State v. Montes</u>, 42 Med. L. Rptr. 2140 (Fla. 17th Cir. Ct. 2014); and <u>Florida v. Wuornos</u>, 19 Med. L. Rptr. 1993 (Fla. 7th Cir. Ct. 1991).

coverage of this case. The extensive and pervasive media coverage also exists worldwide through the internet."

Nor does <u>Lewis</u> or any other Florida case suggest that a trial court must consider expert testimony or empirical studies before (1) concluding that closure of a pretrial hearing is necessary to prevent a serious and imminent threat to the administration of justice, (2) evaluating the availability of alternatives to closure (other than a change of venue), or (3) considering limitations to the breadth of the closure order. The Closure Order is a temporary ruling subject to reconsideration as to subsequent hearings and the trial itself. The Closure Order carefully summarized the evidence, applicable legal authorities, and legal reasoning behind the court's ruling on the petitioners' motions for access, and the court did not depart from the essential requirements of law.

### C.     The Three Orders Regarding Discovery Materials

The petitioners have ignored the trial court's rulings in their favor with respect to most of their requests. Regarding crime scene photographs, in the Third Interim Order the court ordered the release of 602 of 658 photographs, with only 56 to be placed under seal. Of the six videotaped statements addressed in the Second Interim Order, only two were to remain fully sealed. Four of the videotapes were directed to be redacted in part, with the balance of those videotapes to be provided to the petitioners after the court reviewed the redacted

11

copies. Of 29 categories of discovery recapped and ruled upon in the Third Interim Order, all of the items in 13 of the categories were directed to be released to the petitioners; many of the items in seven other categories were directed to be released to the petitioners; and all items in only eight of the categories were ordered to remain under seal (in five of those categories, sealed only "until time of trial").[10]  The trial court's attention to each individual discovery item, and the redaction of only limited sections of the videotapes, reflects careful adherence to the demands of Lewis, section 119.071(2)(e), and the other authorities considered in the First Interim Order.

Following our review of the petitioners' requests, the records themselves, and the trial court's analysis, we find no departure from the essential requirements of law.  We thus deny the petition as to the three orders regarding the discovery materials.

III.    Conclusion

The brief for one of the respondents characterizes the facts of the underlying murder as "tabloid-ready," and that has been proven by the excerpts of publicity placed into the record by the defendants/respondents.  A Miami Herald online

---

[10] Items in the remaining category (number 9) were purported downloads from a cellular phone that could not be retrieved by the court's information technology resources, as of the time the Third Interim Order was entered. The court denied the motion for release as to that category without prejudice due to the technical problems.

12

article about the case reports that "[t]he arrest report reads like a scene from the classic novel Lord of the Flies," and refers again to the "bloody scene." These circumstances could not be ignored as the trial court reviewed inflammatory images and sought to assure the respondents' constitutional right to a fair trial in Miami-Dade County.

Petition denied.